We're going to go on to case 4, 1637-32, United States v. Ford. May it please the court, my name is Brian Mullins and I represent Michael Ford, the appellant in this case. Mr. Ford was with his friend Cameron Hoefel on December 2nd of 2015 when Mr. Hoefel was shot by, they believe, a man named Brian Brinker in Moline, Illinois. The next day, no, I'm sorry, the same day, police interviewed, it appears, Mr. Hoefel at the hospital and a comment was made that the situation would be taken care of on its own. It's not clear who exactly made that comment. An email went out on December 3rd of 2015 in the afternoon by the Moline Police Department to officers in the area stating that Mr. Hoefel had been shot, that he was with four other men, including Mr. Ford and another gentleman named Tyler Minx, and quoting someone as saying that they would be dealing with it on their own. And based on this email, and we do not believe much more, police stopped a car in which Mr. Ford was a passenger and patted him down for a weapon. We do not believe. Why wasn't it reasonable for the officers to think that the three men in the car were possibly on their way to retaliate against Mr. Brinker? I mean, the officers had the warning from the Rock Island Police. These were the very men who had declined to cooperate with the police in the investigation of this shooting. They said they would take care of it. And here they're driving into Moline where Mr. Brinker lives. But also where Mr. Minx lives. A lot of clues. But also where Mr. Minx lives. On the same block, in fact, where they were stopped. And it was about two miles from where Mr. Brinker lives. And I think, you know, two miles in Chicago isn't a great distance. That might be just one corner of the city in the same neighborhood. But in Moline, that's almost that half of the city. And it's really the other side of town. So I don't think the location necessarily. Still two miles. Anywhere you look at it. But I think in the broader scheme of things, in that area, two miles is a fairly, covers a fairly good part of the city. You know, I don't think, I think Mr. Holfill has to be separated from Mr. Ford. And the reasonable suspicion is an individualized determination. Possibly the police had reasonable suspicion to suspect that Mr. Holfill was, might be armed. But there really isn't any information about Mr. Ford's role in retaliating. The email itself is vague. It just mentioned that Mr. Ford was with Mr. Holfill when he was shot. It doesn't mention that Mr. Ford made any comment about retaliating. And the quote, the exact quote, I have the email here, which was submitted as an exhibit at the evidentiary hearing, was that Cameron, meaning Cameron Holfill, nor anyone else is cooperating with the investigation and have stated they would be willing, they would be dealing with it on their own. So we do not believe that there was an individualized suspicion with respect to Mr. Ford. And then... Well, given the open bottle of alcohol at Mr. Ford's feet, could the police have simply arrested him for the open container violation, searched him pursuant to arrest? Well, the open container was not in, he was not driving the car. So I would, I believe that the arrest, the person driving the car would be subject to arrest for an open container in the vehicle. Not everyone in the vehicle? I, I believe it would be the driver. That wasn't what was done. The bottle was at his feet. For an open intoxicant. Yeah. There wasn't what was done and the government hasn't argued inevitable discovery or that issue. Doesn't that surprise you? And, and can't we consider it in evaluating the objective reasonableness of the officer's actions? I think it can be considered. It is a factor, this court has held that an open intoxicant is a factor in the reasonable suspicion analysis because it could suggest that the person subject to the search might be intoxicated and may be willing to do something they otherwise wouldn't do, that their judgment might be impaired. But there isn't any evidence that Mr. Ford was visibly intoxicated. So it's a factor that the court can consider. We do not believe that it takes the case over to the area of reasonable suspicion, that it takes it into that area. And then the behavior of the driver and the occupants was really unremarkable when they were stopped. They were stopped for a traffic violation. They stopped more or less immediately after the squad lights were activated. None of the occupants acted suspiciously. There were no weapons found in the car. And both Mr. Minx and Mr. Holfill were searched and no weapons were found before Mr. Ford was searched. So based on all of those factors, the email itself we do not believe gave the police reasonable suspicion and that did not rise to reasonable suspicion based on Mr. Ford or the other occupants of the vehicle once they were stopped. And, you know, as far as the second issue, I think it's related to the first, whether it was reasonable for the officer to scrunch the item to determine whether it might be a weapon based on what had happened before that there wasn't, we do not believe there was reasonable suspicion that Mr. Ford was armed. We also carry that over. Officers just get one scrunch, is that it? Well, he has to have reasonable suspicion that Mr. Ford was armed to begin with, and we do not believe that was there. I'll save the rest of my time for rebuttal. Good morning, Mr. Phillips. Good morning. May it please the court, Sega Phillips on behalf of the United States. Your Honors, this is exactly what we want police officers to do to prevent violent crime in our neighborhoods. Police officers sent around an email, and my opposing counsel actually quoted from it, and that's right, it said that neither Cameron nor anyone else is cooperating with the investigation and have stated they would be dealing with it on their own. That same email later on says, please use caution when dealing with all of the people involved. Your Honor, listed what you point out were a lot of clues. I'll state quickly that there were, in fact, a few other clues. The alcohol that was involved, the fact that every member in the car had gang entries and violent history, and we haven't even touched on the fact that when he stepped out of the car, he had a heavy item sagging from his coat. I think that in this case. When you say gang entry, what do you mean? Your Honor, when they pull the police report, oftentimes there are entries in there. For example, in this case, the PSR points out that the defendant was a member of the Vice Lords, so. How about the other guys? You know, I don't know what their exact entries were because it wasn't made part of the record. I'll say that the way that the transcript reads, and that's on page 14 of the hearing transcript, it says all of them had entries for these things. Your Honor, of course, if you had entries that said they were all in the Vice Lords, you'd have a lot better case that the officers had a suspicion of a conspiracy to commit a violent crime, right? Yes, Your Honor, though I think we have a substantial amount here. The defendant was at the original shooting. There was information that he and others planned to retaliate from the shooting. It was 3 in the morning. The proximal time was extremely quick. The officer had gotten the email literally right before his shift started and saw them. But the officers did have access to the gang affiliations of the others, but we don't. Am I right? That's correct. That's bad. The court has no further questions. The government will rest on its briefs. Thank you. I just want to clarify the government's reference to the background check on the occupants of the car. At the evidentiary hearing, the officer testified that there were alerts, quote-unquote, for gang entries, weapons, drugs, that type of thing with respect to all of the occupants of the car. I don't know exactly what an alert means, and it wasn't really explained at the hearing. But I think that's a pretty vague basis of knowledge and doesn't really go to either any individual suspect in the car or any specific dates or charges. And they were able to determine if there were any outstanding warrants or prior convictions for weapons offenses, and they verified that there were not. Is it correct, counsel, that you're challenging only the frisk? You're not challenging the stop of the car, are you? Correct. Okay, thank you. I have nothing further to say. Thank you. Thank you very much, Mr. Mullins. Okay. Case will be taken under advisement.